# Richmond

EARNEST C. CODY v. COMMONWEALTH OF VIRGINIA.

December 7, 1942.

Record No. 2609.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and Eggleston, JJ.

The opinion states the case.

*Archer L. Jones* and *H. F. Minter*, for the plaintiff in error.

*Abram P. Staples, Attorney General*, and *Edwin B. Jones, Assistant Attorney General*, for the Commonwealth.

HUDGINS, J., delivered the opinion of the court.

Earnest C. Cody was convicted of murder in the first degree and sentenced to serve thirty years in the State penitentiary. From that judgment of conviction he obtained this writ of error.

While fourteen assignments of error, based on granting and refusing instructions, are set forth in the petition, only two questions are presented: (1) Whether the evidence for the Commonwealth proved a wilful, deliberate and premeditated killing; and, (2), whether the evidence for the accused was sufficient to support an instruction on accidental killing.

About 5:30 p. m. on March 29, 1941, the accused shot and killed his wife in their home located approximately four miles west of Amelia. William F. Wright, a soldier on leave, was visiting in the Cody home. He left the house on the morning of the day of the killing, but returned about quarter past five in the afternoon. As he entered the dwelling he exchanged

greetings with the accused, who was lying on a bed in the room adjoining the kitchen. Wright joined Miss Helen, a daughter of Mr. and Mrs. Cody, in the living room. Soon thereafter Mrs. Cody came in, apparently from the service station 150 yards from the dwelling, and talked to the young people a few minutes. She then went into the kitchen for the purpose of preparing supper. Shortly thereafter Wright heard the back door slam and the accused using loud profane language outside the house. He also heard Mrs. Cody say, "Don't bring the rifle in here, Ernest." The loud talking in excited tones continued. Miss Helen Cody, at the request of her mother, went into the kitchen. She was followed by Wright. Through the door opening into the bedroom he saw the accused sitting on the bed with a rifle in his hands. He asked the accused to give him the rifle, but the accused declined to do so. Then both Mrs. Cody and Miss Helen asked Wright to go back into the living room. In obedience to this request he turned, but, as he turned, he heard the accused say, "Anybody that crosses that door is going to get it." At the same moment he saw Mrs. Cody start walking from the kitchen sink to the door. He had not taken more than a step or two towards the living room when he heard the shot and Mrs. Cody exclaim, "I am shot." He immediately rushed into the bedroom and, after a brief scuffle, took the rifle away from the accused. The bullet struck Mrs. Cody just below the heart. Miss Helen helped her mother to a chair.

At Mrs. Cody's request, Wright hurried to Amelia for medical aid. Shortly thereafter he returned with Dr. Arhart, at whose request he notified M. M. DeCrafft, a deputy sheriff, of the shooting and asked him to go to the Cody home. Wright then was sent after Mrs. Thurber, Mr. Cody's sister, who lived in the neighborhood. When he returned a few minutes later, Mr. V. W. Southall, the Commonwealth attorney, and Mr. DeCrafft had arrived. The accused was hindering rather than helping the doctor in his examination and treatment of the patient. Mrs. Thurber tried to quiet Cody and keep him on the bed. He was exclaiming from

time to time: "Mildred (Mrs. Cody's given name), you are not shot!" "You are just fooling!" "Please get well!" "I did not mean to shoot you." The doctor advised taking Mrs. Cody to the hospital in Farmville. As Wright started to assist her out of the house, Cody attacked him. Wright hit him several times about the face and knocked him across the bed. Wright then carried Mrs. Cody in his arms to an automobile and started to the Farmville hospital, but she died a few minutes after leaving the home.

It is conceded that the accused was sober in the forenoon of the date of the homicide. It is likewise conceded that he had been drinking intermittently for several hours before he shot his wife. The degree of intoxication is in conflict. It follows that, no matter to what extent the accused was intoxicated, his condition was the immediate result of his own voluntary acts. These concessions bring the case within the well established principle that when a person voluntarily becomes intoxicated and is thereby led to commit a crime, he cannot be allowed to hide behind his own condition as an excuse. He, and not others, must take the risk. "As between murder in the first degree and murder in the second degree, voluntary drunkenness may be a legitimate subject of inquiry, but as between murder in the second degree and manslaughter it is never material and cannot be considered." *Johnson* v. *Commonwealth*, 135 Va. 524, 115 S. E. 673, 30 A. L. R. 755. See *Little* v. *Commonwealth*, 163 Va. 1020, 175 S. E. 767.

Wright testified that Cody did not "get along" with his wife, that she "did everything in the world she could for the man," and that a year or more before the killing Cody had pointed a pistol at his wife and threatened her life. Miss Helen Cody testified that, just before the fatal shot was fired, her mother called her into the kitchen and wanted her to go after Cody's sister, because the sister was or had been security on a peace bond that Cody had been compelled to give. It does not appear from the record that Cody was required to give this peace bond because he had abused, struck or beaten his wife. However, he admitted on the stand that about two

years before the date of the killing he had struck his wife and was tried for an offense committed against her.

The Commonwealth's evidence tended to prove that the accused made sales in the service station on the morning and afternoon of the date of the homicide. About thirty minutes before the killing one Lewis Easter, with his son, brought a bag of fertilizer to the Cody home for delivery, at which time Mrs. Cody remarked to Easter that her husband was "dog drunk" but he could go in the house and see him. Easter and his son went in to see Cody, who greeted them in a normal way and gave Easter a check in payment of a $2 debt and the bill for the fertilizer. This witness testified that the accused was drinking but that he knew the amount of the debt he owed and the amount of the fertilizer bill. He signed a check for this sum and joked about the witness writing the check.

As Wright, the doctor and Miss Helen were leaving with Mrs. Cody for the hospital, the deputy sheriff arrested the accused. Cody threatened to resist arrest, but, as soon as the Commonwealth attorney cautioned him, he surrendered quietly and walked to the sheriff's automobile without assistance and without staggering. On the 4-mile drive to Amelia Court House in the car with Mr. Southall and Mr. De Crafft, the accused was sober enough to realize the seriousness of his act in firing the rifle at his wife and stated that he would not make any statements concerning the shooting in the presence of the sheriff or the Commonwealth attorney, as he knew such statements could and would be used against him on his trial. He said that he was going to engage a good lawyer to defend him.

Mr. DeCrafft testified that, while it was apparent that Cody had been drinking, "I could not say he was drunk to the extent of not knowing what he was doing. * * * . He was apparently madder than anything else." Cody expressed no sorrow or regret over the death of his wife.

The foregoing evidence is sufficient to sustain the verdict of the jury, convicting the accused of murder in the first degree.

Counsel for the accused concedes that the principles of law stated in the instructions given for the Commonwealth "have become rock ribbed in the jurisprudence of Virginia, and hoary with age," but that "none of the foregoing principles are applicable to accidental killing. Accidental killing is not an affirmative defense."

The statement in the brief eliminates the necessity for any discussion of the instructions granted for the Commonwealth over the objection of the accused.

The theory of an accidental killing is not supported by any substantial evidence. The testimony of the accused was that he did not remember firing the rifle at his wife and that it was "bound to have been accidental. I had no intention of shooting her." Considering the testimony of the accused at its face value, these statements are not based on any facts shown to be within his knowledge. They are mere guesses.

When asked if he pointed the rifle at her, he stated that he did not remember anything about the rifle, only that he *"carried it in the house.* * * * . The last I remember I had it in the field between the service station and the house." These statements are contradictory. They do not tend to prove an accidental shooting, but they tend to prove that the accused was unconscious of his acts or, rather, that he had no recollection of what he did.

The only other witness who testified as to the shooting was Miss Helen Cody, who was called by the court as its witness. She testified that she heard her father state, in substance, that if any one came into the room he would "get it," or "be shot," and that the shot was fired immediately after her mother moved from the kitchen sink toward the entrance of the bedroom. She further stated that, just before the shot, her father was sitting on the bed with his knees crossed and the gun pointing to the door, that he did not change the position of it until he fired, and that when he fired he raised the gun or laid it across his lap, she could not tell which. Elsewhere in her testimony, she said that he did not raise the gun until after it was fired. This witness' account of the killing is not very clear. She was evidently torn by the love and

affection that she had for each parent, or, perhaps, the horror of seeing her mother brutally killed dulled her ability to perceive and relate the incidents in their true perspective.

However this may be, the testimony of the father and the daughter amounts to nothing more than a scintilla of evidence tending to create a mere suspicion or possibility that the rifle was accidentally discharged. The inference of an accidental killing is not a reasonable hypothesis to be drawn from this testimony.

It is to be remembered that Cody left the bedroom and went outside the house for some purpose. He returned with a .22 rifle, about which he and his wife had a serious quarrel. In this quarrel he used loud and profane language. The quarrel was so intense or so serious that Mrs. Cody requested her daughter to come to her assistance. The daughter expressed fear for her mother's safety when her father had a rifle in the house. The accused, immediately before firing the fatal shot, threatened to shoot any one who crossed a line he had defined, and when his wife was approaching or standing on that line the fatal shot was fired. The statements and actions of the accused eliminate any reasonable hypothesis consistent with his innocence.

We find no reversible error in the action of the trial court in granting the instructions offered by the Commonwealth, or in refusing to give certain instructions requested by the accused.

*Affirmed.*